## MAURICE PINCOFFS COMPANY

v.

## DRAVO MECHLING CORPORATION.

### Civ. A. No. 85–5921.

United States District Court, E.D. Louisiana.

Dec. 7, 1987.

Supplemental Memorandum Opinion Aug. 22, 1988.

Stanley McDermott, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for Maurice Pincoffs Co.

Michael Lodwick, Oneil, Eichin & Miller, New Orleans, La., for defendant, Dravo Mechling Corp.

Conrad S. Williams, Christopher O. Davis, Paul E. O'Brien, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Bussen Terminal Corp.

## MEMORANDUM OPINION

MENTZ, District Judge.

This admiralty action was commenced by Maurice Pincoffs Company, Inc. (Pincoffs), the owner of a cargo of galvanized and cold-rolled steel coils, against Dravo Mechling Corporation (Dravo), the owner of Barge NL–126, alleging water and rust damage to the coils while in the cargo compartment of the Dravo's barge. Dravo filed a third-party complaint against Bussen Terminal Corporation (Bussen), which unloaded a cargo of tubing from Barge NL–126. Dravo and Bussen stipulated that Pincoffs suffered damages of $122,731.82 and that one of them is liable for the damages.

The issue of whether Dravo or Bussen is liable for the damages was tried to the Court without a jury. After hearing the evidence, the Court directed the parties to submit post-trial briefs addressing the factual and legal issues raised. Having reviewed the evidence, the parties' briefs and the applicable law, the Court now renders its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). To the extent any findings of fact are conclusions of law, they are adopted as such; to the extent any conclusions of law are findings of fact, they are so adopted.

## FINDINGS OF FACT

1.

Pincoffs was the owner of the cargo of galvanized and cold-rolled steel coils in

question. Dravo was the owner and operator of the Barge NL–126. Bussen was the stevedore that unloaded a cargo of tubing from Barge NL–126 at Bussen Terminal, St. Louis, Missouri.

2.

Pincoffs had a cargo of seventy-eight coils of steel (49 cold-rolled; 29 galvanized) shipped from Durban, South Africa to New Orleans, Louisiana aboard the M/V TENCHBANK. Pincoffs employed Dravo to receive the coils from the TENCHBANK and carry them to Granite City Terminal, Granite City, Illinois. On February 4, 1985, the M/V TENCHBANK arrived in New Orleans and Dravo placed the Barge NL–126 alongside to receive the coils.

3.

Barge NL–126 is made of welded steel and measures $195 \times 35 \times 12$ feet. The cargo compartment is completely surrounded on the bottom and sides by void spaces that separate it from the vessel's outer hull. The cargo compartment is fitted with eight rolling steel covers which must be locked with binder chains to prevent them from coming open. The parties agree that the barge's cargo compartment was in good condition and that the water that damaged the coils could not have entered the barge through the walls or bottom of the cargo compartment. The parties also agree that the water entered the barge while one or more of its covers was open.

4.

William Leslie, a marine surveyor hired by Pincoffs, attended the discharge/loading of the coils from the M/V TENCH-BANK into Barge NL–126 on February 4, 5, and 6, 1985. Stevedores hired by the ocean vessel loaded the coils into the barge. Prior to loading, Leslie examined the barge and found it substantially clean and dry. He noted that the barge covers were generally undamaged.

5.

Discharge/loading operations commenced at 7:00 a.m. on February 4, 1985. Four barge covers were opened to receive the cargo. The coils were loaded in light rain until operations were stopped at 3:00 p.m. due to the rain. New Orleans received 0.20 inches of rain on February 4, 1985.

6.

Discharge operations resumed at 8:00 a.m. on February 5, 1985. The operations conducted between 9:30 a.m. and 12:00 p.m. were accomplished in intermittent light to moderate rain. As a result, the coils handled during that time were wetted. Operations stopped at 12:00 p.m. due to rain. New Orleans received 3.64 inches of rain on February 5, 1985.

7.

Discharge operations resumed at 8:00 a.m. on February 6, 1985. Discharge was completed at 12:00 p.m. on that date. New Orleans received 0.06 inches of rain on February 6, 1985.

8.

The seventy-eight coils were arranged around the perimeter of the hopper in two single rows of twenty-nine coils, ten coils stored at the forward end of the barge, and another ten coils stowed at the aft end of the barge. The coils were wrapped in wax-paper, plastic and steel. During loading some coils sustained damage to their protective wrappings, making them more susceptible to water damage.

9.

As a matter of general practice, Dravo has a field service representative observe the loading process to determine any risks to the cargo. Such risks, including damage due to water or open covers, are noted in a barge inspection report.

10.

R. Borelli, field service representative for Dravo, observed the loading of the coils into Barge NL–126 on February 4, 1985. He noted instances of streaking, light rust, gouges, ripples, dents, covers adrift, and exposed contents. He also noted that the hopper was "ok", but that the coils were loaded in light rain. Dravo did not call Mr. Borelli to testify at trial. There is no evidence that a field service representative observed the loading on February 5 or 6, 1985.

**11.**

Due to the substantial amount of rainfall on February 5, 1985 and the fact that the coils were loaded on that date in moderate rain, the Court finds that rainwater entered the barge through the four open barge covers on that date; however, to attempt to determine the exact amount would be speculation.

**12.**

After the coils were loaded, Dravo moved the barge to the Compass fleeting facility in New Orleans. On February 7, 1985, Dravo had a local fleet tug pick up Barge NL–126 and move it to the Louisiana Avenue Wharf in New Orleans alongside the M/V GREAT OCEAN to receive a cargo of tubing owned by a company not involved in this lawsuit. The tubing was to be delivered at Bussen Terminal, St. Louis, Missouri.

**13.**

David Landry, another field service representative for Dravo, observed the loading of the tubing into Barge NL–126 on February 7, 1985. The tubing was loaded in the center of the barge under the No. 4 and 5 covers between the rows of coils on either side of the compartment. He noted that the hopper was clean and dry and that the stevedores closed the covers upon completion of loading. There was no rain in New Orleans on February 7, 1985.

**14.**

After the tubing was loaded, Dravo moved the barge back to Compass fleeting facility where it remained overnight. The next day, Dravo moved Barge NL–126 to the Dravo fleeting facility where it remained approximately nine days. On February 17, 1985, Barge NL–126 was placed in a flotilla of eight barges and towed up the Mississippi River. On February 18, 1985, the barge arrived in Baton Rouge, Louisiana where sixteen barges were added

to the tow. Then, the flotilla proceeded upriver to St. Louis. On February 25, 1985, the flotilla entered the Ohio River, dropped off eighteen barges, returned to the Mississippi River and resumed the voyage to St. Louis. The flotilla arrived in the St. Louis area on February 28, 1985. Barge NL–126 was placed at the J.B. fleeting facility adjacent to Bussen Terminal, where it remained for five days. On March 4, 1985, a local fleet tug hired by Dravo moved Barge NL–126 to Bussen's dock.

**15.**

The first Bussen employee to see the barge was Michael Callis. He was second man in charge next to Larry Moallankamp, the foreman. On the morning of March 4, 1985 Callis was in charge because Moallankamp was late arriving to work. At 6:30 a.m., Callis inspected the barge and found the No. 8 barge cover open approximately one foot to eighteen inches. He attempted to close the cover by hand but was unable to move it.

**16.**

At 7:10 a.m. the Bussen stevedores opened the two center barge covers (Nos. 4 and 5) with the Bussen crane in order to discharge the tubing. Callis inspected the cargo compartment prior to offloading the cargo. He discovered an accumulation of approximately one-half to one inch of water in the starboard stern corner of the barge.[1]

**17.**

When Larry Moallankamp arrived at work at 8:30 a.m., the Bussen stevedores were unloading the tubing. Callis told him the No. 8 cover was open. Moallankamp then inspected the barge himself and found the No. 8 cover open. All other covers, except Nos. 4 and 5, which had been opened to remove the tubing, were closed. Moallankamp observed an accumulation of water in the barge where the covers were

---

1. This was Callis' testimony at trial, which corresponds with his statement given fourteen days after the event. Callis' trial testimony and statement apparently conflict with his deposition testimony. Although Callis' deposition is not in evidence, it was brought out at trial that, at least at one point in his deposition which is subject to interpretation, Callis testified that there was no water in the barge, but only dried rust flakes. The Court credits Callis' trial testimony because it comports with his statement given fourteen days after the event, whereas the deposition was given eighteen months later. Callis, himself, testified that his statement was the most accurate account of the facts.

open. Although he was unable to estimate the amount of water, he did not believe it was enough to pump.

### 18.

The discharge of the tubing took approximately seven hours. The Nos. 4 and 5 barge covers remained open during that time. The airport recorded .31 inches of rain during the hours of unloading. There is no dispute that the rain drizzled intermittently during the unloading. None of the crew wore rain gear. Bussen did not interrupt the unloading because of the rain. Loading/unloading steel coils in light rain is a common practice. Coils with protective wrappings are not harmed by exposure to drizzle.

### 19.

The rain during the unloading at Bussen's Terminal was significantly lighter than the rain during the loading in New Orleans. Also, because more barge covers were open in New Orleans, a greater number of coils were exposed to water during loading in New Orleans than in St. Louis.

### 20.

Moallankamp inspected the barge prior to closing its covers. He discovered very little difference in the accumulation of water in the stern of the barge, and still believed it was not enough to pump. Under the Nos. 4 and 5 covers, he observed only dampness, but no accumulation of water.

### 21.

On completion of unloading the tubing, Bussen closed and latched the Nos. 4 and 5 covers with the Bussen crane. The barge was positioned so that the crane could not reach the No. 8 cover. The stevedores attempted to close the No. 8 cover by hand, but were unsuccessful. Moallankamp normally would have informed the barge owner or his employer about the open cover. He admits that he failed to do so in this case, and that it would have been prudent to do so. It would have been possible for the tugboat captain to push the barge under Bussen's crane to close the No. 8 cover, had he been requested to do so. When the Bussen stevedores left Barge NL–126, there were no gaps in any barge covers except the No. 8. There is no evidence regarding the condition of the cargo at the time the barge was delivered to Bussen or when it left Bussen.

### 22.

A local fleet tug hired by Dravo picked up Barge NL–126 and moved it back to the J.B. fleeting facility. On March 5, 1985, Barge NL–126 was picked up by another Dravo hired tug and moved to Art's fleeting facility in Granite City, Illinois. The barge remained in that fleet until March 8, 1985 when it was moved to the Granite City Terminal for discharge of the steel coils. There was no rainfall on March 5 or 6, 1985. On March 7, 1985, it rained .32 inches.

### 23.

In the early morning on March 8, 1985, Keith Smith, the Granite City Terminal manager, was called to the barge because the stevedores had found gaps in the barge covers. Smith observed an 8–10 inch gap in the No. 8 cover and both latches were up, but not broken. He also observed the Nos. 6 and 7 covers ajar with one latch broken off, one not locked, and the port chain binder, a latching mechanism, missing.

### 24.

Smith ordered his crew to open the barge. They rolled covers No. 8, 7, 6, 5, and half of 4 to the south to expose ½ of the barge. From the dock, Smith observed coils sitting in water, several bands broken on the coils and outer cans damaged due to handling. The coils were not braced or blocked with wood to prevent them from moving around in the barge. Smith considered the barge poorly loaded. Smith contacted the consignees, who verbally rejected the cargo. Pincoffs instructed him not to discharge any materials and to close the barge. The crew closed the barge properly with the aid of a crane and locked down all hatches, including Nos. 8, 6, and 7. They encountered no difficulty in closing the covers.

**25.**

Barge NL–126 was moved back to Art's Fleeting facility. A few hours later, Dravo's surveyor, Paul Huber, inspected the barge and found the No. 1 cover open approximately 6 inches. All other covers were closed. Huber measured the water in the barge and found that it was 3 inches at its deepest point. Huber concluded that if the barge covers were closed, the barge was weathertight and no water should have entered the barge. Huber closed the No. 1 cover.

**26.**

Bussen's surveyor, John Stockman, examined the barge three days later on March 11, 1985. He noted that the port No. 1 cover was not latched and that the port binder chains between the Nos. 4 and 5 covers and the Nos. 6 and 7 covers were broken. Stockman testified that the covers can work lose if the binders are not secure. He concluded that because wetted coils were found in non-wet areas that some of the damage was due to condensation, as well as an open barge cover.

**27.**

Also on March 11, 1984, Pincoff's surveyor, Mr. Leslie, examined the barge. He found the Nos. 6 and 7 covers ajar.

**28.**

Although it is not clear what caused the barge covers to come open, the missing or broken latches made them prone to coming open. In any event, it is clear that the barge covers had a propensity to move. On March 4, Bussen discovered that the No. 8 cover was open. On March 8, the Nos. 6 and 7 covers were open approximately 6 inches. A few hours later, the No. 1 cover was found open about 6 inches. On March 11, the Nos. 6 and 7 covers were found ajar.

**29.**

It was Dravo's practice to have a crew member inspect the barges in tow and report any problems to the pilot, who would then make a log entry. During the voyage upriver, Barge NL–126 was handled by several different tugs and placed at various fleeting facilities, which were hired by Dra-

vo. Dravo did not offer any testimony from any crew members of the M/V PEACE or any of the local fleet tugs hired by Dravo regarding the condition of the barge during the entire course of the tow. Nor is there any evidence of the inspection procedures actually employed. In view of the fact that over a four day period (March 4–8), the No. 8 cover was open and no one at Dravo discovered the condition, the Court believes that Dravo did not conduct diligent inspections of the barge. As a consequence, there is no evidence as to how long the No. 8 cover had been open when Bussen discovered it on the morning of March 4.

**30.**

Considering the tendency of the barge covers to come open, the Court finds that it is likely that the covers came open during the voyage. The Court further finds that rainwater entered the barge through open hatch covers when the coils were loaded in New Orleans and when the covers came open at various times during the voyage and in St. Louis. This conclusion is supported by the fact that damaged coils were found randomly throughout the barge, and not just under the No. 8 cover (starboard stern) where water had accumulated.

## CONCLUSIONS OF LAW

**1.**

This Court has jurisdiction in admiralty and venue is proper in the Eastern District of Louisiana. 28 U.S.C. § 1333.

**2.**

By virtue of the stipulation between Dravo and Bussen that one of them is liable to Pincoffs, Dravo, as carrier, has the burden of proving that it exercised due diligence to prevent the damage. In an attempt to sustain this burden of proof, Dravo offered evidence that Bussen was negligent in performing its duties.

**3.**

Bussen was obligated to perform its duties in a proper, safe and workmanlike manner. Failure of a stevedore to exercise reasonable care constitutes negli-

gence. A stevedore may be held liable for any damage done to a cargo due to its negligence. *Nissho–Iwai v. MARITIME UNITY*, 1983 A.M.C. 2149, 2157 (E.D.La. 1982); *American Honda Motor Co., Inc. v. ATLIS*, 1978 A.M.C. 2010, 2016 (S.D.N.Y. 1978).

4.

█ The Court finds that Bussen was negligent and breached its warranty of workmanlike performance in failing to inform Dravo about the No. 8 cover being open. *See F.J. Walker, Ltd. v. M/V LEMONCORE*, 561 F.2d 1138, 1148 (5th Cir. 1977). Had Bussen so informed Dravo, the barge could have been repositioned so that the crane could reach and close the No. 8 cover.

5.

█ If the No. 8 cover had been closed, the risk of damage to the coils would have been minimized, but not eliminated. As stated, Dravo produced no evidence regarding the actual condition of the barge during the tow or inspection procedures actually employed. The evidence does show, however, that rainwater wetted the coils on loading, that the covers had a tendency to come open due in part to broken or missing latches, and that rainwater entered not only the No. 8 cover, but other open covers as well. Accordingly, Dravo has not exonerated itself from liability because it has not established its own due diligence to avoid or prevent the damage.

6.

The Court finds responsibility for the damage to the coils to be apportioned fifty percent to Dravo and fifty percent to Bussen.

Accordingly,

IT IS ORDERED that judgment be entered in favor of plaintiff, Maurice Pincoffs Company, Inc., in the amount of $122,-731.81, and against defendant, Dravo Mechling Corporation for fifty percent of the judgment, and against defendant, Bussen Terminal Corporation, for fifty percent of the judgment, with defendants to bear costs in accordance with the apportionment of damages and legal interest to run from the date of judgment.

## SUPPLEMENTAL MEMORANDUM OPINION

Before the Court is the motion of third-party defendant, Bussen Terminal Corporation, to alter or amend judgment. The motion was submitted to the Court without oral argument. The Court now renders its ruling.

On a prior date, this Court issued a Memorandum Opinion finding Dravo Mechling Corporation (Dravo) and Bussen Terminal Corporation (Bussen) equally liable for the rust damage to plaintiff's steel coils. Bussen contends that the Court's apportionment of damages is in error because: 1) there is no evidence that the negligence attributed to Bussen contributed to the loss; 2) Dravo failed to meet its burden of proving the proportion of damage attributable to Bussen; and 3) the equal apportionment of damages is unfair.

The negligence attributed to Bussen was based on its failure to inform Dravo that the No. 8 cover of the barge had been found open and could not be shut. The Court specifically found, based on the trial testimony and exhibits, that this negligence was a cause of the loss. The evidence established that after the barge left Bussen's control, cover No. 8 remained open until March 8th, four days later. On March 7th, it rained .32 inches. Had Bussen informed Dravo that the cover was open, Dravo could have repositioned the barge so that the crane could close the cover and thereby diminish the amount of rain that entered the barge between March 4th and March 8th. Accordingly, the Court will not alter its finding that Bussen's negligence was a cause of the loss.

In *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 407, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975), the Supreme Court stated:

We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision

or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault. Since the Supreme Court's decision in *Reliable Transfer*, courts have applied proportional fault to cases involving disputes between vessels and stevedores over cargo losses. *See Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir. 1985); *Agrico Chemical Company v. M/V Ben W. Martin*, 664 F.2d 85, 94 (5th Cir. 1981); *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1099 (5th Cir.1981).

Based on *Reliable Transfer* and the fact that there was no evidence to determine what proportion of rust damage was attributable to each of the wrongdoing parties, this Court assessed damages in equal proportions. *See also Master Shipping Agency, Inc. v. M.S. Farida*, 571 F.2d 131, 133–134 (2d Cir.1978) (district court's equal division of damages not clearly erroneous where apportionment of damages would be speculative).

The Court is aware of three cases which support Bussen's argument that Dravo should be held 100% liable for all damages because Dravo failed to carry its burden of proving the proportion of damages attributable to Bussen. *See American Honda Motor Co. v. S.S. Atlis*, 1978 A.M.C. 2010, 2018 (S.D.N.Y.); *Levatino Co. v. M/S Helvig Torm*, 295 F.Supp. 725 (S.D.N.Y.1968); and *St. Paul Fire & Marine Ins. Co. v. Trinity*, 1967 A.M.C. 1768 (C.D.Cal.) However, considering Bussen's fault, it would be inequitable and contrary to the holding in *Reliable Transfer* to assess Dravo with 100% of the damages. In addition, none of the three cases cited above discuss *Reliable Transfer; Levatino* and *Trinity* were decided prior to *Reliable Transfer; American Honda* was decided one month after *Reliable Transfer*.

■ On reconsideration of the facts in the case at bar, the Court also believes that it is inequitable to divide damages equally. Despite the fact that Dravo did not produce specific evidence which would allow the Court to determine what proportion of rust was caused by Bussen's negligence, the evidence is sufficient to allocate degrees of fault. Dravo's barge was unseaworthy when it was delivered to Bussen. Due to Dravo's failure to make periodic inspections, the Court has no evidence as to how long cover No. 8 was open before Bussen discovered it. The barge was in Dravo's custody for approximately one month; it was in Bussen's custody for approximately twelve hours and cover No. 8 remained open for four days thereafter. Dravo's fault lay in the unseaworthiness of its barge and in its failure to make periodic inspections; Bussen's fault lay in failing to inform Dravo that cover No. 8 was open, a condition which Dravo could have prevented in the exercise of due diligence. Accordingly,

IT IS ORDERED that Bussen Terminal Corporation's motion to alter or amend judgment is GRANTED. The judgment shall be AMENDED to reflect fault in the following proportions: Dravo Mechling Corporation, 90%; Bussen Terminal Corporation, 10%.