CONTINENTAL GRAIN COMPANY, Molinos Nacionales, Inc., and Eagle Star Insurance Company of America, Plaintiffs,

v.

PUERTO RICO MARITIME SHIPPING AUTHORITY, Puerto Rico Marine Management, Inc., the Government of Grenada Marketing National Import Board, Defendants.

Civ. No. 88–0001 GG.

United States District Court,
D.Puerto Rico.

Jan. 11, 1991.

Antonio M. Bird, Jr., San Juan, Puerto Rico, for plaintiffs.

Jiménez, Graffam & Lausell, Nicolás Jiménez, San Juan, Puerto Rico, for defendants.

## OPINION

GIERBOLINI, District Judge.

### I. INTRODUCTION

On January 14, 1987, the M/V ALBATROS (the "ALBATROS") encountered rough weather twenty miles off the island of Dominique. Due to winds of thirty to forty knots and choppy seas, the merchandise in the cargo hold of the ALBATROS which had been improperly stowed shifted to port, forcing the vessel to take a list to port which increased until the crew abandoned it, and the ALBATROS capsized and sank. Continental Grain Company ("Continental"), the charterer and owner of the lost merchandise, Molinos Nacionales, Inc. ("Molinos")[1], the sellers and stevedores, and Eagle Star Insurance, the insurer of the cargo, brought suit against the owners of the ALBATROS, the Government of Grenada and the Grenada Marketing Na-

---

1. Molinos is Continental's wholly-owned subsidiary which operates in Guánica, Puerto Rico distributing and manufacturing mixed animal feeds and commercial flour. (Deposition of E. Bigas at 7).

tional Import Board (referred herein jointly as the "Import Board").[2]

Defendants counterclaimed for the value of the vessel[3] asserting claims for breach of the charter party, breach of the stevedore's warranty of workmanlike service and negligence. Jurisdiction is predicated on 28 U.S.C. § 1333(1).

Both plaintiffs and defendants moved for summary judgment. The case was submitted to the United States Magistrate for Report and Recommendation, who on April 24, 1990, recommended the entry of summary judgment in favor of defendants. Plaintiffs filed a timely opposition to the Magistrate's Report and Recommendation.

## II. SUMMARY JUDGMENT

In determining whether summary judgment is appropriate, the court must view the record in the light most favorable to the party opposing the motion, and indulge all inferences favorable to that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 633–34 (1st Cir.1990). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *General Office Products v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077 (1st Cir. 1986).

Guided by this standard, and after an extensive review of the depositions, affidavits, exhibits, memoranda and briefs submitted by both parties, we find that summary judgment in favor of defendants is warranted.

## III. DISCUSSION

### A. THE VOYAGE

On December 1986, Continental entered into a voyage charter contract with the Import Board to transport two loads of grain in bulk from Guánica, Puerto Rico to the islands of Guadaloupe and Martinique. The ALBATROS made three voyages to and from Guánica and Guadaloupe and Martinique under the charter contract. On the fourth and final voyage, Continental directed the ALBATROS to Guánica for the loading of cargo which was to be performed by its subsidiary and the seller of the cargo, Molinos. The delivery basis under the purchase contract between Continental and Molinos for the cargo was "F.O.B. Guánica Stowed and Trimmed" and the delivery basis on the sales contract between Continental and the buyer of the cargo was "Delivery By Vessel C.I.F. Martinique Free Out."

The cargo on the fourth voyage consisted of 245.13 metric tons of whole u.s. corn in bulk, 80.36 metric tons of soy bean meal in bulk, and 998, twenty-five pound bags of layer and broiler premix. Under the terms of sale "F.O.B. Guánica Stowed and Trimmed", Molinos provided all the loading equipment, personnel and supervision for the loading operation. To assist in the loading operation, Molinos hired Luis Ayala Colón Sucesores, Inc. ("Ayala"), a Ponce stevedoring contractor, who planned and actually loaded the ALBATROS with 18 stevedores.[4]

The cargo aboard the ALBATROS was stowed in the same manner as it had been stowed on the previous three voyages. At the completion of the loading, stowing and trimming operation, the cargo hold of the

---

**2.** Grenada Marketing National Import Board, the owner of the ALBATROS is a public corporation created by the Government of Grenada.

**3.** The defendants received the value of the vessel in the amount of U.S. $167,000.00 from their insurer who having paid the claim has become subrogated to the rights of the defendants. The Import Board continues to claim the difference between the insured value of the vessel and the actual value of the ALBATROS at the time of sinking.

**4.** All of the loading work was performed by Molinos with the assistance of Ayala, except that the ship engineer operated the crane on board to lift the cargo.

ALBATROS was left partially filled. As a receipt for the grain cargo, Captain McLawrence signed a Puerto Rico Maritime Shipping Authority ("PRMSA") short form of bill of lading.[5]

### B. THE VOYAGE CHARTER AGREEMENT

■ Maritime law divides contracts for the transportation of goods into two categories: common and private carriage. T.J. Schoenbaum, *Admiralty and Maritime Law* § 9–6, at 292 (1987). The agreement between Continental and the Import Board for the chartering of the ALBATROS was a private carriage agreement.[6] *See* 2A *Benedict on Admiralty* § 22, at 3–2 (7th ed. 1985) ("Where one shipper's cargo takes up the full reach of the ship, it will be presumed ... that the ship is a private carrier ..."). The difference between common and private carriage is significant. In common carrier contracts, the shipowner insures the transportation of the goods until delivery. In private carriage, however, the shipowner is "only liable for loss or damage to the extent this was proximately caused by a breach of an obligation contained in a contract of carriage." T.J. Schoenbaum, *supra*, § 9–6, at 293. The private carriage agreement in this case had no express clause allocating the risk for loss or damage to either the cargo or the vessel.

■ The rights and obligations under a private carriage agreement are determined by the contract between the parties which may be in the form of a bill of lading or a written or oral agreement. In private carriage, the parties may agree to govern their agreement by the Carriage of Goods by Sea Act ("COGSA")[7] or the Harter Act.[8] *See Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1107–1111 (E.D.N.Y. 1985) (charter agreement not the bill of lading is contract and its terms governs legal relationship, not COGSA); *Sucrest Corp. v. M/V JENNIFER*, 455 F.Supp. 371, 380 (N.D.Maine 1981) ("[c]harter party governs rights and liabilities of the parties. COGSA, of course, would apply if the bill of lading served as the contract for the carriage of the [goods]"); *see also* T.J. Schoenbaum, *supra,* § 10–7, at 392 ("[COGSA] and other bills of lading statutes normally do not apply to charter parties, although COGSA may apply by contract through a Clause Paramount, or even by operation of law if the parties specify that the bill of lading should govern their relations").

■ Plaintiffs contend that the bill of lading governed the relationship among the parties. We disagree. The evidence shows that the bill of lading served as the receipt for the grain; the contract for the carriage of the goods was the charter agreement. *See Alamo Barge Lines, Inc. v. Rim Maritime Co., Ltd.,* 596 F.Supp. 1026, 1035 (E.D.La.1984) (bill of lading constituted a mere receipt for the goods carried); 2A *Benedict on Admiralty* § 34, at 4–13 ("[A]ny bill of lading which may be issued [in private carriage] serves only as a receipt for the cargo and, when in negotiable form as an indicia of title ...").

■ A fundamental principle in the contractual relationship between a shipowner and the charterer is that "the responsibility for cargo loss falls on the [party] who agreed to perform the duty involved." *Nissho–Iwai Co. Ltd v. M/T Stolt Lion*, 617 F.2d 907, 914 (2d Cir.1980), *appeal after remand,* 719 F.2d 34 (2d Cir. 1983). Absent an express contractual provision to the contrary, the duty to load,

---

5. The operations manager for Molinos explained in his deposition that a PRMSA form was used because Molinos did not have a Molinos bill of lading form at the time. (Deposition of E. Bigas 25). The conduct of the parties regarding the use of the PRMSA form demonstrates that the bill of lading had no independent legal significance; it merely served as a receipt for the cargo.

6. A charter agreement is a contract governed by federal contract law. *Compass Marine Corp. v. Calorie Rigging Co.,* 716 F.Supp. 176, 180 (E.D. Pa.1989).

7. 46 U.S.C.App. § 1300 *et seq.* If a bill of lading is issued as evidence of the carriage contract, then the statutory scheme of COGSA would govern.

8. 46 U.S.C.App. § 190 *et seq.*

stow, trim and discharge the vessel cargo remains the obligation of the vessel owner and the consequences for failing to do so properly fall upon the vessel owner. *Nichimen Company, Inc. v. M/V Farland*, 462 F.2d 319 (2d Cir.1972); *Wright v. P.J. St. Pierre*, 1990 AMC 325, 1989 WL 211485 (S.D.Tex.1989). However, these duties may be shifted to the charterer by express provision. As one commentator has stated:

> [U]nder a voyage charter, if the charter party requires the charterer to do the loading, stowing, and unloading with his stevedores at his risk and expense, the negligence of those stevedores will make the charterer, not the owner, bear the loss [of cargo]. (citations omitted).

Bauer, *Responsibilities Of Owner And Charterer To Third Parties–Consequences Under Time And Voyage Charters*, 49 Tul.L.Rev. 996, 1012 (1975) [hereinafter *Voyage Charters*].

■ The issue is whether only one party was responsible for the negligent stowage and loss of the cargo and, if so, whether that party must also bear the responsibility for the loss of the vessel. Generally, the party responsible for stowing cargo, who performs this task negligently is liable for any damage proximately caused by the negligent stowage, including the loss of the vessel. *Nichimen Company v. M.V. Farland*, 462 F.2d 319 (2d Cir.1972); *Dow Chemical Pacific v. Rascator Maritime S.A.*, 594 F.Supp. 1490, 1496 (S.D.N.Y. 1984); T.J. Schoenbaum, *supra*, § 10–12, at 493. Under the circumstances of this case, this general rule is appropriate.

■ The parties disagree vigorously as to whether under the terms of the consecutive voyage charter, responsibility for loading and stowing the cargo remained on the vessel owner or was shifted to the charterer. Under a FREE–IN–AND–OUT ("FIO") term, the owner of the vessel does not pay for the loading and discharging costs of the cargo, but it retains the complete responsibility for all loading, storage and unloading of the cargo. Under a FREE–IN–AND–OUT–STOWED–AND–TRIMMED ("FIOST") term, the responsibility for the loading, stowing and trimming is transferred to the charterer.

The oral agreement between the parties was negotiated by Victor Swierad, an agent for Continental and José Martinez, a general agent for the Import Board. Each negotiator gave his version of the oral agreement and opined as to which party had the obligation to stow and trim the cargo. Not surprisingly, their respective versions are in conflict. However, the evidence is abundant and clear and we find, that Continental, through its agents Molinos and Ayala, assumed the responsibility for loading, stowing and trimming the cargo on board the ALBATROS.[9] Consequently, the agreement between Continental and the Import Board was a FIOST contract.

The conduct of the parties confirms that the terms were FIOST and that Continental through its agents exercised primary responsibility for loading, stowing and trimming the cargo on board the ALBATROS. The operations manager for Molinos testified that Ayala planned the loading of the ALBATROS. (Deposition of E. Bigas at 41). Molinos paid for the labor of Ayala. (Deposition of J. Stuewe at 12, 25). The production manager for Molinos testified that he had the overall supervision of the loading operation.[10] The course of the loading operation indicates that there was no division of authority in the supervision

---

9. On December 28, 1988, Continental brought a third party complaint against Ayala for any claim defendants (the Import Board) had against Continental regarding the breach of stevedores warranty of workmanlike performance or for negligent stowing of the cargo. Subsequently, Continental settled out of court with Ayala. (See Order and Partial Judgment of June 2, 1989).

10. "The overall supervision was my responsibility to see that we delivered the grain to the vessel and Ayala Colón was responsible to put it on the vessel and then report back to me." (Deposition of J. Stuewe 27–28) Question: "Was there anybody in charge of supervising the loading and unloading of ships on behalf of Molinos Nacionales?" "I guess I would have to say that I ultimately was ..." (Deposition of J. Stuewe 7–8). In addition, Edgardo Bigas of Molinos stated that John Stuewe was in charge of the stevedores. (Deposition of E. Bigas at 15).

of the operation; Continental was in charge. In fact, Captain McLawrence was absent from the vessel in the initial stages of the loading operation. (Deposition of B. McLawrence at 64, 65). Consequently, since the stevedores were Continental's agents, Continental was responsible for the improper stowing of the cargo.

Continental argues that even if the terms were FIOST it did not assume the risk of loss for the cargo because these are merely sales terms to pass along the loading and unloading expenses and not chartering conditions. Continental's contention that the obligations created under the sales agreement are unrelated to the charter obligations is not persuasive and can not be sustained. The sales agreement modified the chartering agreement by setting forth the terms of loading the cargo and shifting to Continental the risk of loss. As one authority has stated: "The carriage contract is usually ancillary to a commercial transaction between the seller and buyer of goods." T.J. Schoenbaum, *supra*, § 9–6, at 275.

Alternatively, Continental contends that the words "stowed and trimmed" only evidenced the intention of the parties to allocate the cost, but not the risk of stowage. We disagree. Courts have held that a party who controls the process of loading, stowing and discharging cargo, also assumes the risk of loss for performing this task negligently. *Nichimen Company v. M.V. Farland*, 462 F.2d 319 (2d Cir.1972); *Dow Chemical Pacific v. Rascator Maritime S.A.*, 594 F.Supp. 1490, 1496 (S.D.N.Y. 1984).

■■■■ In oral voyage charter contracts like the one at hand, where no express provision is made for allocating the risk of vessel loss, the risk properly falls on the party that performed the improper stowing which proximately caused the loss of the vessel. *Nichimen Company v. M.V. Farland* and its progeny stand for the proposition that once the responsibility for loading and stowing the cargo has shifted to the charterer, the shipowner is not liable for improper stowing which damages the cargo and the vessel.[11]

The nature of the loading operation shows that the parties intended that Continental would bear ultimate responsibility for the loss of the vessel since Continental was in a better position than the Import Board to prevent the sinking of the AL-BATROS. *Georgia Pacific Corporation v. Motorship Marilyn*, 331 F.Supp. 776 (1971) (shipowner entitled to assume that stevedores hired by the charterer "would stow the cargo in a manner designed to withstand the normal perils of the sea"). We find that Continental's negligent stowage of the cargo proximately caused the sinking of the ALBATROS.

## C. THE WARRANTY OF SEAWORTHINESS

■■■■ Unless otherwise agreed by the shipowner and the charterer, the warranty of seaworthiness is implied in every charter. *Morales v. Galveston*, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962), *reh'g denied*, 371 U.S. 853, 83 S.Ct. 16, 9 L.Ed.2d 93 (1962); C. Black & G. Gilmore, *The Law of Admiralty* § 4–5, at 209 (2d ed. 1975). The charterer's obligation to properly load and stow the cargo does not discharge the shipowner from his implied warranty of seaworthiness. Bauer, *Voyage Charters, supra*, at 1005 (*citing Olsen v. United States Shipping Co.*, 213 F. 18 (2d Cir. 1914)).

Seaworthiness has been defined as:

a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful

---

**11.** In *Nichimen*, the Second Circuit recognized that shifting the risk of loss to the charterer had limits. It stated: "[T]o some extent clause 8 shifts responsibility for stowage to the charterer; the difficult question is how far." *Id.* at 331. In this case, the parties were free to allocate the risk of loss; their agreement shows that Continental was fully responsible for the loading and stowing of the cargo, and therefore, it assumed the risk of loss for the negligent performance of its responsibilities.

master of sound judgment and discretion ...

*Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1155 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

 The ALBATROS was 131′ in length, built in 1952 and purchased by the Import Board in 1980 for U.S. $201,000. (Deposition of B. McLawrence at 115–16). The Import Board maintained the ALBATROS adequately; among the parts that were replaced were the engine, two generators, a complete deck, the crane, the radar, the radios, ballast tank tops and forepeak tank. (Deposition B. McLawrence at 181). In October of 1986, the Bureau Veritaes Classification Society inspected the ALBATROS and found it qualified within its class. (Deposition B. McLawrence at 120).

Captain McLawrence had ultimate responsibility for the aspects of the loading and stowing that affected the trim, stability and seaworthiness of the ALBATROS, and his actions demonstrate that he acted like a competent and skillful master. The Captain was an experienced master; he had served at sea for twenty-two years. Captain McLawrence was master of a vessel for five years before he became the master of the ALBATROS, a position he held for four and half years. (Deposition of B. McLawrence at 14–15, 30–31). The Captain inspected the trim of the vessel at the conclusion of the loading and stowing operation and found that the ALBATROS had no list. (Deposition B. McLawrence at 143). The crew of the ALBATROS was similarly competent and adequate in numbers. In short, the defendants have shown by a "preponderance of the evidence that they provided a seaworthy vessel and that they were free from fault regarding the cause of damage." *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 718 (1st Cir. 1984). The general rule of liability applies in this case, namely, that "liability for on board stowage and handling of cargo will be placed upon the charterers unless the master neglects the performance of his duty regarding seaworthiness or requires improper stowage against the charterer's wishes." T.J. Schoenbaum, *supra,* § 10–12, at 403 (citations omitted).

### D. DID THE ALBATROS FAIL TO COMPLY WITH REGULATIONS AND/OR A STATUTE?

 Under the doctrine of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), a ship which at the time of an accident is in actual violation of a statute is presumptively at fault for the accident.

Plaintiffs argue that the *Pennsylvania* doctrine applies in the instant case because the ALBATROS allegedly violated the Coast Guard regulations for bulk grain cargoes, codified at 46 C.F.R. § 93.20 (1989) and the Intergovernmental Maritime Consultative Organization ("IMCO") Resolution A.264(VIII), Amendment to Chapter VI, Safety of Life at Sea Convention ("SOLAS").[12] We disagree. Neither the Coast Guard regulations nor the SOLAS resolution applied to the ALBATROS.

The vessels that are subject to the Coast Guard regulations are described in 46 C.F.R. § 90.05 which states in pertinent part: "[T]he regulations in this subchapter that apply to a vessel on an "international voyage" apply to a vessel that— (1) Is mechanically propelled and of at least 500 gross tons ..." Because the ALBATROS weighed only 299.30 tons it was exempted from compliance with these regulations. *Cf. U.S. v. Ultramar Shipping Co., Inc.,* 685 F.Supp. 887, 891 (S.D.N.Y.1987) (light vessels are not required to carry bulk grain according to International Regulations). The provisions of SOLAS are equally inapplicable because they apply only to vessels of nations which have formally accepted the 1960 SOLAS Convention. Grenada, the owner of the ALBATROS, is not a signatory nation to the SOLAS Convention.

### E. THE STEVEDORE'S WARRANTY OF WORKMANLIKE PERFORMANCE

 In *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.,* 350 U.S.

---

**12.** 16 U.S.T., 185 T.I.A.S. No. 5780.

124, 76 S.Ct. 232, 100 L.Ed. 133 (1955), the Supreme Court held that a stevedore warrants performance of its services in a workmanlike manner and the stevedore will indemnify the shipowner for any liability arising out of a breach of that warranty. *See, i.e., Maurice Pincoffs Co. v. Dravo Mechling Corp.*, 697 F.Supp. 244, 250 (E.D. La.1987) (stevedore may be held liable for any damage done to a cargo under warranty of workmanlike performance). The implied warranty of workmanlike performance extends beyond those in contractual privity with the stevedore. *Waterman S/S Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 424, 81 S.Ct. 200, 202, 5 L.Ed.2d 169 (1960); S. Sorkin, *Goods in Transit* § 14.14[3], at 14–52 (1986). The warranty has been applied in cases involving damage solely to cargo. *Federal Com. & Nav. Co. v. Calumet Harbor Terminals*, 542 F.2d 437, 441 (7th Cir.1976).

The Magistrate found that plaintiffs owed a warranty of workmanlike performance to the owners of the ALBATROS and it was breached by improperly stowing the cargo. *Cf. Scinda Steam Navigation Co. v. De los Santos*, 451 U.S. 156, 172, 101 S.Ct. 1614, 1624, 68 L.Ed.2d 1 (1981) ("[T]he shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore").[13] Bigas described the stowing operation in this manner:

> The first thing that was unloaded was the corn, which was in bulk loaded on inside the hold, then the corn was levelled out, a separation was put of plastic material, and the soy, the soybean meal was poured on top. After the soybean meal was poured, the hold was closed and the ship or the vessel's crane lifted pallets of bags of premixes and centered them on top of the deck. (Deposition of E. Bigas at 19).

At no time was the grain secured. The testimony indicates that at the conclusion of the loading operation two feet of space remained between the stow and the underdeck. (Deposition of B. McLawrence at 60) (Deposition of J. Stuewe at 24).

We find, as the Magistrate did, that the Import Board was entitled to rely on the expertise and responsibility of Continental's stevedores. In other words, the improper stowing by Molinos and Ayala can be attributed to Continental. The *Ryan* warranty extends to reach the circumstances of this case.[14] This is not the case where a shipowner can not rely on the *Ryan* warranty because his own conduct prevented or hindered the stevedore's performance. *See, i.e., Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).

The stevedores were negligent in two respects. First, for not stowing and trimming (1) the corn uniformly in the cargo hold and (2) the soy bean meal uniformly on top of the corn. The weight of the soy bean meal, a bulkier product, would have prevented the corn, a less massive product, from shifting forward in the cargo hold. (Deposition of E. Bigas at 38). The National Cargo Bureau has "concluded that no matter how carefully a grain vessel was

---

**13.** Plaintiffs may have avoided *Ryan* liability by the use of an express clause disclaiming the implied warranty of workmanlike performance. *Elgie & Co. v. S.S. "S.A. Nederburg"*, 599 F.2d 1177, 1183 (2nd Cir.1979).

**14.** We are not unmindful that the Fifth and Sixth Circuits have circumscribed the reach of the *Ryan* doctrine to cases involving indemnification for personal injuries. *See Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1256 (6th Cir.1988) (refusing to extend the *Ryan* doctrine to cases involving property damages); *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 784–86 (5th Cir.1986) (same); *Gator Marine Serv., etc. v. J. Ray McDermott & Co.*, 651 F.2d

1096 (5th Cir.1981) (same). However, those cases are distinguishable from this case by the fact that the vessel owner was found to be concurrently negligent with the stevedores. *See, i.e., Gator*, 651 F.2d at 1100 ("In *Ryan* cases, the Supreme Court has never foreclosed the possibility that vessel negligence might defeat an indemnity recovery under the warranty of workmanlike performance doctrine").

Furthermore, even if we were to reject the application of *Ryan* in this case, plaintiffs would still be liable under a negligence theory. As our discussion in this opinion suggest, we find that defendants exercised reasonable care with respect to the cargo and its stowage.

514

loaded, an estimated average void space of some 18 inches would exist in each loading compartment." *Petition of Long*, 293 F.Supp. 172 (1968).

Second, the stevedores should have secured the cargo properly. Even if the cargo was stowed in a less than skillful manner, it may have been prevented from shifting forward in the hold if it had been fastened and secured properly. Apparently, grain once stowed in the cargo hold settles down to some degree due to the vibration of the ship's engine and the rolling of the ship over the sea, thus increasing the amount of open space in the cargo hold. 6 *Benedict on Admiralty, supra*, § 14–420.

The real basis of *Ryan* indemnity—that liability should fall upon the party best situated to adopt preventive measures—is fully applicable in this case because Continental was better situated than defendants to prevent the load from shifting. Continental should have known that grain cargoes, by their very nature, are likely to shift and, therefore, appropriate precautions should have been taken to prevent such a shift from taking place.

## IV. CONCLUSION

Since there are no genuine issues of fact pending regarding the issue of liability, defendant's motion for summary judgment is hereby GRANTED. Accordingly, judgment shall be entered against the plaintiffs dismissing the complaint and granting defendant's counterclaim. The case will continue on the issue on damages.

SO ORDERED.