**ARMCO CHILE PRODEIN, S.A., and Compania De Seguros Cruz Del Sur, S.A., Plaintiffs,**

v.

**The M/V NORLANDIA, etc., in rem, and Scheepvaartmij Antigua, in personam, Defendants.**

No. 90–1081–Civ–J–20.

United States District Court,
M.D. Florida,
Jacksonville Division.

March 27, 1995.

Machale A. Miller, Alfred J. Rufty, III, O'Neil, Eichin, Miller & Breckinridge, New Orleans, LA, Alan B. Vlcek, Alan B. Vlcek, P.A., G.J. Rod Sullivan, Jr., Law Offices of Sullivan & Boyd, Jacksonville, FL, for plaintiffs.

Robert E. Warren, Taylor, Moseley & Joyner, P.A., Jacksonville, FL, for defendants.

### *ORDER AND OPINION*

SCHLESINGER, District Judge.

Trial in this cause was held before the undersigned. Based on the testimony and evidence received during trial, and the applicable legal standards, the Court makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiffs, Armco Chile Prodein, S.A. ("Armco") and Compania De Seguros Cruz Del Sur, S.A. ("Cruz"), are suing the M/V Norlandia, *in rem,* and Scheepvaartmij Antigua ("Antigua"), *in personam.* This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has jurisdiction of this cause pursuant to 28 U.S.C. § 1333.

This is an action for damage to a cargo of filament wound, fiberglass reinforced pipes

carried aboard the NORLANDIA from Jacksonville, Florida to Talcahuano, Chile in November of 1989. The owner of the pipes, Armco, and its insurer, Cruz, have brought this action against the vessel and its owner, Antigua, to recover for damage to the pipes.

H.A. Simons is an engineering/construction firm in Vancouver, British Columbia. H.A. Simons contracted with Celluloso del Pacifico, S.A. ("Celpac"), a Chilean company, for construction of a paper mill in Renaico, Chile.

Armco is a Chilean company engaged in the business of manufacturing and selling filament wound, fiberglass reinforced pipes. Armco contracted with Celpac to supply approximately 27 kilometers of filament wound, fiberglass reinforced pipes to be used to transport the effluent from Celpac's paper mill near Renaico, Chile to a distant river.

The contract between Armco and Celpac set forth a delivery schedule requiring delivery of a certain number of pieces of pipe per month between November of 1989 and November of 1990.

Armco, knowing that it might not have its pipe plant in Chile on-line in time to meet the delivery schedule for the pipes, negotiated a provision in its contract with Celpac allowing Armco to subcontract the manufacture of a portion of the pipes to Price Brothers, Inc. ("Price Brothers"), which is located in Green Cove Springs, Florida.

Armco contracted with Price Brothers to manufacture 497 pieces of pipe. Each of the 497 pieces measured sixty feet in length. 207 pieces measured 900mm in inner diameter. 290 pieces measured 100 mm in inner diameter.

It was Armco's responsibility to ship the pipes from Florida to Chile. Thus, Armco entered into a conline booking note with Meridian Ship, Inc. ("Meridian")[1] on October 30, 1989. *See* Conline Booking Liner Booking Note (Plaintiffs' Ex. No. 45).

Meridian was in the business of locating cargo owners interested in having their cargoes shipped. Meridian contracted with those owners for shipment and then chartered (i.e., leased) vessels from various shipowners who actually performed the transportation aboard the vessel. Meridian specialized in project cargoes.

The booking note called for direct transit from Jacksonville to Talcahuano. *See* Clause 7 of the Addendum to the Booking Note. The booking note also stated that Meridian was to oversee the packing of the cargo. *See* Clause 6 of the Addendum to the Booking Note.

Meridian chartered the NORLANDIA from Antigua, the owner of the vessel, to use in connection with the transportation of Armco's/Price Brothers' pipes. *See* Charter Party (Plaintiffs' Ex. No. 81).

The charter party expressly gave Meridian authority to sign bills of lading on behalf of the master of the NORLANDIA. *See* Clause 33 of the Charter Party (Plaintiffs' Ex. No. 81).

Prior to shipping the pipes, Meridian received details concerning the nature, characteristics and strength of the pipes. Armco provided Meridian with the dimensions and weights of the pipes. At a meeting in October of 1989, Price Brothers provided Meridian with information concerning tensile strength, ovality and hoop strength, among other things.

Meridian also asked Armco about permissible stacking heights. In response to this, Meridian was informed that if the carrier wished to stack four high, then the upper tier should consist of unnested pipes, and stiffeners should be placed between the lower two tiers so that the weight of the upper tiers would be borne by the stiffeners rather than the pipes. *See* Plaintiffs' Ex. Nos. 17 and 39.

The freight for the ocean voyage was calculated by volume. To minimize the cost, the pipes were nested. This means that the 900mm pipes were inserted into the 1000mm pipes.

These nested pipes were then placed two (2) across on nine (9) wooden saddles. The saddles or cradles were made of 4″ × 6″ timbers with chocks to prevent the pipes from rolling.

[1]. Meridian has petitioned for bankruptcy and is currently involved in Chapter 7 proceedings.

Only one rate of freight was offered for the transportation of the pipes. Alternate freight rates were not offered.

Armco insured the cargo under a policy of all-risk cargo insurance which provided the coverage for the damages forming the basis of this litigation.

Cruz is a Chilean insurance company that provided cargo insurance to Armco for the fiberglass pipes that were carried aboard the NORLANDIA.

After the pipes were nested and packaged, Price Brothers loaded the pipes onto trucks for transport from Green Cove Springs to the Jacksonville dock. The pipes were properly constructed and in good order and condition and free of starbursts, cracks, crazings, delaminations and any other damage when they left Price Brothers' plant on trucks for the Jacksonville dock. Price Brothers' quality control inspectors examined each and every pipe after manufacture and supervised the nesting and loading onto the trucks.

Jerry Winters, Price Brothers' plant manager, and Jack Welch, Meridian's pipe engineer/project consultant, accompanied the first few truckloads from Price Brothers' plant to the dock. Mr. Winters and Mr. Welch observed that the transit from Green Cove Springs to Jacksonville occurred without incident.

On or about November 23, 1989, the cargo of 497 fiberglass pipes was delivered to Defendants at the port of Jacksonville, Florida.

Mr. Winters was in attendance when the initial loads of pipe were discharged from the trucks. Mr. Winters instructed the ocean carrier and its stevedores on the proper techniques to be used in off-loading the pipes from the trucks. Mr. Winters was satisfied that the pipes were properly off-loaded from the trucks and landed on the dock in good order and condition.

The pipes on the dock were inspected and no damage was found. Furthermore, no resin was found on the trucks that transported the pipes from Green Cove Springs to Jacksonville.

The shipment of this cargo is evidenced by a bill of lading issued on or about November 24, 1989. Meridian's agent, Palmetto Shipping and Stevedoring Company, Inc., ("Palmetto Shipping") signed the bill of lading. The bill of lading is evidence that the cargo was delivered in apparent good order and condition.

The pipes were loaded on the NORLANDIA both below-deck and on-deck.

The bill of lading was claused to show the partial on deck stowage.

Approximately 414 pieces of pipe were loaded below deck and approximately 83 pieces were loaded on deck.

All of the evidence indicates that the pipes were in good order and condition when delivered to the dock and loaded aboard the vessel.

■ The pipes were inadequately stowed on the NORLANDIA, causing them to flex unchecked and unfettered while the NORLANDIA pitched, heaved and rolled. The Captain of a ship is the party ultimately responsible for ascertaining if the cargo can be safely carried. In the instant action, this could have been done by preventing the movement or motion of the cargo. The Captain is the person who has the final responsibility for the safety of the cargo.

Cargo on a ship can move on three different axes—vertical movement in two directions—up and down when the ship rises and falls between peaks of waves; horizontal movement in 4 directions—towards bow and stern when the ship pitches front and aft, and port starboard (right and left) as the ship rolls from side to side. Such movement can be prevented by using dunnage such as $4'' \times 4''$ lengths of timber to prevent horizontal movement and by using a false plywood floor with $4'' \times 4''$ legs to prevent vertical movement. Also, blocks of wood and lashing straps can impede some movement.

The deck cargo was loaded in two locations. One portion was loaded in the forward reaches of the ship. The other portion was loaded in the aft reaches of the vessel. Most of the deck cargo was loaded to a height of three tiers. Only unnested pipes were load-

ed on deck. The deck cargo was lashed down. Chains were placed over the pipes with small pieces of wood placed between the chains and the pipes. This, however, was inadequate. The chains cut into the pipes. The pipes should have been lashed by placing the chains over the wooden cradles on which the pipes were sitting.

The pipes on-deck were not properly secured. Expert testimony established that periodic inspections of the on-deck pipes were required so that the lashings, loosened by the pitching of the ship, could be tightened as needed. Defendants failed to take this precaution. As a result, the on-deck cargo came adrift and the pipes were battered while flailing about loosely on deck.

With respect to the cargo carried below deck, Defendants failed to tie the cargo down. This could have easily been done without damaging the pipes. Rather than putting the strapping around the pipes, the straps could have been placed across the wood cradles in which the pipes were packaged.

No restraining device of any kind was applied to prevent the below deck cargo from moving. This permitted the flexible cargo to flex up and down during the ocean transit.

Vertical and horizontal restraints should have been utilized so that the cargo would move as one with the vessel when the vessel rolled, pitched and heaved in the ocean.

The cargo stowed below deck was stacked four tiers high. Nested pipes were loaded in all four tiers, even though many bundles of unnested pipe were available and could have been used to lighten the load on the lower layers of pipe.

Furthermore, because no stiffeners were used in the packaging, the lower tiers of pipes had to bear the full weight of the tiers above.

Armco knew the pipes were going to be stacked four high. Nevertheless, stiffeners were not put in the packaging.

On the same note, Meridian knew that if they were going to stack four high, stiffeners needed to be used in the lower two tiers. Nevertheless, when the pipes arrived and no stiffeners were utilized in the packaging, the pipes were still stacked four high.

No dunnage was placed on the tanktop (i.e., the floor of the hold) to level the surface. No dunnage was placed along the sides of the vessel to prevent the pipes from making contact with the steel sides of the hold and sustaining chaffing damage.

To minimize the dynamic loads and resultant stresses, horizontal and vertical restraints should have been utilized. Defendants failure to properly stow the pipes subjected the pipes to excessive forces during the voyage, thereby causing starbursts, cracks and delaminations.

Additionally, by failing to lash down the pipes and by stowing the pipes four tiers high knowing that the packaging did not contain stiffeners between the lower two tiers and by not using unnested pipes to compose the highest tier, Defendants failed to properly stow the cargo.

Although the booking note between Meridian and Armco expressly called for direct transit, Meridian contracted with Southern Peru Copper Co. to ship three trucks from New Orleans to Peru.

After loading the pipes in Jacksonville, the NORLANDIA headed towards New Orleans.

The NORLANDIA proceeded southbound down the east coast of Florida. Upon reaching the tip of Florida, instead of taking the direct route to Talcahuano, Chile by proceeding southwesterly toward the Panama Canal, the NORLANDIA headed northwesterly to New Orleans.

By heading northwest upon rounding the southern tip of Florida, instead of taking the Windward Passage to the east of Cuba as a vessel bound for Chile normally would do, the NORLANDIA deviated its course by approximately 800 miles.

On the way to New Orleans the NORLANDIA encountered a storm. The NORLANDIA would not have encountered the storm if it had taken the direct route to Chile.

During the storm, the lashings on the pipes stowed on-deck came loose and 24 pieces of pipe fell overboard.

No claim is being asserted in these proceedings for the pipes lost overboard. That claim has already been paid by the liability insurer.

Additionally, the heavy seas of the storm caused or contributed to the below deck cargo sustaining further damage.

The NORLANDIA reached Talcahuano, Chile on December 21, 1989.

Discharge of the cargo began at approximately 8:00 P.M. and continued through the night. Discharge was completed on December 22nd at approximately 12:00 P.M.

No notice of damage was given to the vessel at the time of discharge.

During discharge, Messrs. Dasso and Olivares of Armco saw white, resin powder on the floor of the hold of the NORLANDIA in lines tracing the outlines of the pipes, thus suggesting the pipes had been banging about during voyage. Residue in the hold of the ship indicates that the pipes moved into each other and chaffed each other during the voyage.

It appears that the cargo shifted during voyage because of the spacing left between the stacks of pipe. Additionally, there was neither lashing, bracing nor stiffeners on the cargo below deck.

After discharge, the cargo was placed into the customs yard at Talcahuano.

Subsequent to discharge, a number of bundles of pipe were transported by truck from Talcahuano to Renaico, where the pipes were stored for inspection. Renaico is approximately 140 miles inland from the port of Talcahuano. A large portion of this transportation was over unpaved roads.

While the pipes were being inspected at Renaico, Armco discovered that, in addition to the damage to the deck cargo of which it was already aware, the below-deck cargo had sustained damage as well. Damage in the form of cracks, starbursts and delaminations were discovered.

The pipes remaining at Talcahuano were inspected on January 17, 1990, and were found to have the same extent of damage as that appearing on the pipes already trucked to Renaico.

Armco informed Meridian of the damage on January 18, 1990.

Interestingly, Plaintiffs contend that the nature and extent of the damage could not be detected immediately upon discharge for a variety of reasons: Much of the discharge occurred at night; Christmas and New Years arrived on the heels of the December discharge; and the pipes upon discharge were piled up in a customs yard near the wharf, rendering meaningful inspection of the individual pipes a practical impossibility.

Yet, on January 17, 1990, Plaintiffs inspected the remaining pipes at Talcahuano. It appears to the Court that the pipes could have been inspected at Talcahuano shortly after discharge.

Determining the full extent of the damage took approximately a month because the pipes had to be unnested. On February 7, 1990, Armco, along with Celpac and H.A. Simons determined that the extensive damage to the pipes caused them not to be fit for their intended use. The pipes were rejected and sold for salvage. Meridian was informed of this on February 8, 1990. Only four pipes were found acceptable.

Fiberglass pipes similar to that of the pipes in this case have been shipped on numerous occasions on ocean vessels around the world without damage. The pipes in the instant action were manufactured to withstand this sea voyage.

Because the NORLANDIA cargo was rejected and because the Armco plant in Chile was not on-line, Armco placed an order with Price Brothers for a replacement shipment. These replacement pipes were also manufactured in Green Cove Springs, but were shipped out of Mobile, Alabama.

The initial production of one hundred and twelve (112) pipes were shipped aboard the HUA FENG in March of 1990 and arrived in Chile near the end of March or the beginning of April.

The remaining shipment was shipped out of Mobile in May of 1990 aboard the SANTA FE and arrived in Chile in the latter part of May 1990.

Pipes from each of these replacement shipments sustained physical damage similar to that sustained by the NORLANDIA pipes. However, most of the replacement pipes were repaired and eventually used, unlike the pipes in the instant case.

With regard to the shipments on the HUA FENG and SANTA FE, the packaging was different than that utilized for the NORLANDIA cargo. Both the packaging and the method of handling were dictated by Price Brothers without any input from Meridian. The configuration of the vessels were also different.

■ The Carriage of Goods by Sea Act ("COGSA") applies of its own force whenever a bill of lading is issued for the carriage of goods in foreign trade to or from ports of the United States. *See* 46 U.S.C.App. § 1300; *Nichimen Co. Inc. v. M/V FARLAND*, 462 F.2d 319 (2d Cir.1972); *Samsung America, Inc. v. M/T FORT PRODUCER*, 798 F.Supp. 184 (S.D.N.Y.1992); *Excel Shipping Corp. v. Seatrain International S.A.*, 584 F.Supp. 734 (E.D.N.Y.1984).

Thus, the rights and liabilities of the parties to this dispute are governed by COGSA. COGSA, however, does not apply of its own force to a contract for on-deck shipment. *See* 46 U.S.C.App. § 1301(c). However, a contract of carriage may incorporate and apply COGSA to on-deck shipments. *See Ampac Trading Co. v. M/V MING SUMMER*, 566 F.Supp. 104 (W.D.Wash.1983). In the instant case, the bill of lading was claused to show the partial on deck stowage. Thus, COGSA applies to all of the cargo shipped in this case.

### A. CARRIER STATUS

First of all, the Court finds that it is axiomatic that the NORLANDIA, the vessel that carried the cargo that is the subject of this lawsuit, is a "carrier." The sailing of the vessel with cargo aboard constituted a ratification of the bill of lading. *See Demsey & Associates, Inc. v. S.S. SEA STAR*, 461 F.2d 1009, 1015 (2d Cir.1972). Additionally, Defendants have not disputed the NORLANDIA's carrier status. Thus, the Court finds that liability runs to the NORLANDIA *in rem*.

■ Defendants, however, contest Antigua's carrier status. Antigua is the vessel owner. Under COGSA, suit may be brought against the ship, charterers, or the owner. However, depending on the relationship of the parties, the provisions of the charter, and who actually issued the bill of lading, there may not be joint liability in every instance. Bills of lading that are signed by the master, or on behalf of the master (with authority to do so) will bind the shipowner as well as the charterer. However, should the charterer undertake to issue and sign the bill of lading on its own, the charterer and the ship will be liable but the owner will not be liable *in personam*. *See S.S. SEA STAR*, 461 F.2d 1009; *United Nations Children's Fund v. S.S. NORDSTERN*, 251 F.Supp. 833 (S.D.N.Y.1965). The issue is whether the NORLANDIA's owner is liable *in personam* for the misdeeds of the charterer by virtue of the charterer's authority to sign the bill of lading for the master.

There can be *in personam* liability against Antigua only if Antigua is a "carrier" of goods by sea. *See* 46 U.S.C.App. § 1302; *Associated Metals & Minerals Corp. v. S.S. PORTORIA*, 484 F.2d 460, 462 (5th Cir. 1973).[2] COGSA provides that the "term 'carrier' includes the owner or charterer who enters into a contract of carriage with a shipper." 46 U.S.C.App. § 1301(a).

■ Thus, COGSA is applicable to a shipowner that has chartered its vessel to a COGSA carrier only when the shipowner has entered into a contract of carriage with the shipper or has some privity of contract with the shipper. *See EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 719 (1st Cir.1984); *In re Intercontinental Properties Management, S.A.*, 604 F.2d 254, 258 (4th Cir.1979).

Contracts of carriage include only those "covered by a bill of lading or any similar document of title...." 46 U.S.C.App.

---

**2.** All cases decided by the former Fifth Circuit Court of Appeals prior to the close of business on September 30, 1981, are binding on the Eleventh Circuit and on all district courts within the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

§ 1301(b). "A contract of carriage with an owner may either be direct between the parties, or by virtue of a charterer's authority to bind the owner signing bills of lading 'for the master.'" *Pacific Employers Ins. Co. v. M/V GLORIA,* 767 F.2d 229, 236 (5th Cir. 1985) (quoting *In re Intercontinental Properties Management, S.A.,* 604 F.2d at 258 n. 3).

The owner of the NORLANDIA, Antigua, time-chartered the vessel to Meridian. That agreement is set forth in the Charter Party dated October 31, 1989. The Charter Party used in the instant action is the standard New York Produce Exchange Form. The terms of the Charter Party entitle Meridian, the charterer of the vessel, to issue bills of lading on behalf of the master. Clause 33 of the Charter Party provides:

> The Master authorizes the Charterers or their Agents to sign Bills of Lading on his behalf, in conformity with mate's receipts. Owners are absolved of any claims as a result of any Bills of Lading being signed by Charterers or their Agents which do not conform with Mate's receipt.

Plaintiff's Ex. No. 81.

Thus, the owner of the NORLANDIA, Antigua, anticipated being responsible for cargo carried on its ship as long as the bills of lading conformed with the mate's receipt, even if the bills of lading were signed by the charterer or its agents. Antigua has made no argument that the bill of lading issued in this case did not conform with the mate's receipt.

■ Upon completion of loading the pipes aboard the NORLANDIA, Palmetto Shipping signed the bill of lading as agents for Meridian. The bill of lading does not state that Palmetto Shipping signed "for the master." However, the bill of lading provides: "IN WITNESS whereof the Master of the said Vessel has signed the number of original Bills of Lading stated below...." This, in conjunction with Clause 33 of the Charter Party, is sufficient to hold that Antigua is a carrier. Even though the bill of lading was not signed "for the Master," the Court finds that the bill of lading was signed on behalf of the Master.

In *S.S. NORDSTERN,* 251 F.Supp. 833 (S.D.N.Y.1965), a case Defendants cite in support of their argument that Antigua is not a carrier, the court found that the owner was not a carrier because the shipper accepted the bill of lading from the charterer and obtained neither the owner's bill nor that of the master. In *S.S. NORDSTERN,* however, there were no facts produced to substantiate that the signer of the bill of lading had authority to sign for the owner and/or master, *see S.S. NORDSTERN,* 251 F.Supp. at 838 n. 6, unlike in the instant case where the Charter Party states that the charterer has authority to sign for the master. *See* Clause 33 of the Charter Party.

In *Yeramex International v. S.S. TENDO,* 595 F.2d 943 (4th Cir.1979), another case Defendants cite in support of their contention that Antigua is not a carrier, the back side of the bill of lading contained a "Contracting Parties" clause, which stated:

> [T]he contract evidenced by this [Bill of Lading] is between the Merchant and the Carrier, MCL, Ltd. and it is agreed that MCL Ltd. **only** shall be liable as Carrier under this [bill of lading].

However, in the instant case, the bill of lading contained no such clause. In *S.S. TENDO,* there was an additional clause in the charter party stating that the Charterers were to indemnify Owners from all consequences arising out of the Master or agents signing Bills of Lading in accordance with the Charterers' instructions.

In *S.S. TENDO,* the court based its decision that the owner was not a carrier on the fact that the applicable charter provisions showed that the charterer assumed exclusive responsibility for handling cargo and issuing bills of lading. Additionally, the Fourth Circuit found that no authority existed for the charterer to bind the owner to the terms of the bill of lading as a contracting party, unlike in this case.

In *Joo Seng Hong Kong Co., Ltd. v. S.S. UNIBULKFIR,* 483 F.Supp. 43 (S.D.N.Y. 1979), Judge Sand of the Southern District of New York outlined the following three factors to determine who may be subject to suit under COGSA: (1) who signed the bills of lading; (2) whose form was used for the bill

of lading; and (3) was authority given to sign the bill of lading on behalf of another. *S.S. UNIBULKFIR*, 483 F.Supp. at 45–46. The court in *S.S. UNIBULKFIR* encouraged a broad reading of COGSA liability, but it indicated that an exception should be made where one party expressly assumes exclusive carrier status, *see id.* at 46 & n. 7, as in *S.S. TENDO.*

In *Tube Products of India v. S.S. RIO GRANDE*, 334 F.Supp. 1039 (S.D.N.Y.1971), another case cited by Defendants, the vessel owner was held not responsible for damage to cargo upon finding that bills of lading were signed by time charterers "for the master," and that the vessel owners did not authorize the charterers to do so. In *S.S. RIO GRANDE* the charterer was without authority to sign for the master. Here, Meridian and its agents were expressly given authority to sign for the master.

In *S.S. RIO GRANDE*, the court stated that "[i]t is apparent that if either the bills of lading were signed by the master or [the owner] expressly authorized the time charterer to sign such documents on its behalf, the vessel's owner could properly be looked to for damage suffered by a consignee of cargo." *S.S. RIO GRANDE*, 334 F.Supp. at 1041 (citation omitted). However, if the bill of lading was signed by the time charterer in a nonrepresentative capacity, the ship's owner would be free from any responsibility.

The Court finds that Antigua was a party to the bill of lading and is, thus, a "carrier." "Courts have imposed liability ... on owners ... who are not signatories to a bill of lading if there is 'some evidence tying the party to the bill involved.'" *Samsung America, Inc. v. M/T FORT PRODUCER*, 798 F.Supp. 184, 187 (S.D.N.Y.1992) (quoting *S.S. UNIBULKFIR*, 483 F.Supp. at 46).

When Palmetto Shipping signed the bill of lading as Meridian's Agent, and Meridian and its agents had authority from Antigua to sign for the master, "the vessel owner became liable *in personam*, and the vessel liable *in rem*, in the event there should be any failure in the performance of the contract of carriage the bills of lading evidenced." *Instituto Cubano de Estabilizacion del Azucar v. T/V GOLDEN WEST*, 246 F.2d 802 (2d Cir.), *cert. denied*, 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957).

## B. BURDENS OF PROOF

■ "The burden of proof under COGSA shifts more frequently than the wind on a stormy sea." *Banana Services, Inc. v. M/V FLEETWAVE*, 911 F.2d 519 (11th Cir.1990). A cargo claimant establishes a prima facie case of liability upon proving that the cargo was received by the carrier in good condition and delivered in bad condition. *See Terman Foods v. Omega Lines*, 707 F.2d 1225 (11th Cir.1983); *Blasser Bros. v. Northern PanAmerican Line*, 628 F.2d 376 (5th Cir.1980). This is often referred to in shorthand as proof of good order/bad order. A clean bill of lading issued by the carrier is prima facie evidence the goods were received as described and creates a rebuttable presumption that the goods were received in good condition. *See Terman Foods*, 707 F.2d at 1227; *Blasser Bros.*, 628 F.2d at 381.

■ Once the claimant establishes a prima facie case of liability, the burden shifts to the carrier to prove that the damage resulted from a cause set out in section 1304(2). *See Terman Foods*, 707 F.2d at 1227; *Blasser Bros.*, 628 F.2d at 381. If the carrier is unable to rebut claimants prima facie case, the carrier is liable for all damages. *Blasser Bros.*, 628 F.2d at 382.

■ If the carrier is able to rebut the prima facie case of liability, the burden shifts back to the claimant to prove the carrier was negligent and that such negligence was at least a concurrent cause of the damage. *See Terman Foods*, 707 F.2d at 1227; *Blasser Bros.*, 628 F.2d at 382.

If the claimant is able to prove at least concurrent negligence, the burden shifts back to the carrier to apportion between the portion of damages caused by an exception and the portion of damages caused by its negligence. Failure of the carrier to differentiate causes of damage renders the carrier liable for the entire damage. *See The Vallescura*, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Blasser Bros.*, 628 F.2d at 382.

## C. GOOD ORDER/BAD ORDER

### 1. Good Order

The Court finds that Plaintiffs have met their burden that the cargo was received by the carriers in good order.

■ To begin the analysis, a clean bill of lading was issued. This is prima facie evidence that the cargo was received as described. *See Sumitomo Corp. v. M/V SAINT VENTURE*, 683 F.Supp. 1361, 1367 (M.D.Fla.1988). Defendants failed to rebut this presumption.

Additionally, the Court finds that even without this presumption, Plaintiffs have shown good order through direct and circumstantial evidence. Plaintiffs have shown that the pipes were properly constructed and in good order when they left Price Brothers' plant on trucks for the Jacksonville dock. Price Brothers' quality control inspectors examined each and every pipe after manufacture and supervised the nesting of the pipes and the loading of the pipes onto the trucks. The Court finds that the pipes were in good order and free of starbursts, cracks, crazings, delaminations and any other damage when they left the plant.

Mr. Jerry Winters, Price Brothers' plant manager, was in attendance when the initial loads of pipe were discharged from the trucks onto the dock. Mr. Winters instructed the ocean carrier and the stevedores on the proper techniques to be used in off-loading the pipes from the trucks. Mr. Winters was satisfied that the pipes were properly off-loaded from the trucks and landed on the dock in good order and condition. The pipes on the dock were inspected and no damage was found. As further proof that the trip from Price Brothers' plant to the dock did not cause the damage, no resin was found on the trucks that transported the pipes. The Court finds that the transportation of the pipes by truck from Price Brothers' plant to the Jacksonville dock went smoothly and did nothing to alter the good order and condition of the pipes.

### 2. Bad Order

■ The Court also finds that Plaintiffs have met their burden of showing that when the cargo was delivered to Plaintiffs in Talcahuano, Chile it was in bad order. After the discharge of the pipes on December 22, 1989, resin powder was clearly visible on the floor of the hold of the NORLANDIA in lines tracing the outlines of the pipes, thus suggesting that the pipes had been hitting each other and the walls of the ship during the voyage.

Defendants argue that the cargo is presumed to have been discharged in the condition reflected in the bill of lading since Plaintiffs did not notify them of the damage within three days of delivery. Article 3(6) of COGSA provides in pertinent part that:

> [u]nless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damages is not apparent, the notice must be given within three days of the delivery.

46 U.S.C.App. § 1303(6). This is a rebuttable presumption which the Court finds Plaintiffs have rebutted.

The failure to provide notice of damage within the time allotted under Section 1303(6) is of no moment if the shipper comes forward with sufficient evidence to suggest that the cargo was damaged before it was discharged by the carrier. *See M/V GLORIA*, 767 F.2d 229; *Socony Mobil Oil Co., Inc. v. Texas Coastal & International, Inc.*, 559 F.2d 1008 (5th Cir.1977).

Subsequent to the discharge of the cargo, a number of bundles of pipe were transported by truck from Talcahuano to Renaico, where the pipes were stored for inspection. While inspecting these bundles of pipe at Renaico, Armco discovered that there was damage in the form of cracks, starbursts and delaminations. The remaining pipes at Talcahuano were inspected on January 17, 1990, and were found to have the same extent of damage as that appearing on the pipes already trucked to Renaico. Thus, the Court

finds that even though the trip from Talcahuano to Renaico is approximately 140 miles over mostly unpaved roads, it was not this trip that caused the damage to the pipes. Rather, the pipes were damaged during the ocean transit.

### D. DEFENDANTS' DEFENSES/SEGREGATION OF DAMAGES

■ The Court finds that the carriers violated 46 U.S.C.App. § 1302, which provides that "[t]he carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." In order to properly care for cargo, the carrier is obliged to know the nature and characteristics of that cargo and to provide the cargo with care commensurate with its nature and characteristics. *See The Vallescura*, 293 U.S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *Amerada Hess Corp. v. S.S. PHILLIPS OKLAHOMA*, 558 F.Supp. 1164 (S.D.N.Y.1983). As stated earlier, the Court finds that Plaintiffs' cargo was inadequately stowed on the NORLANDIA, causing the pipes to flex unchecked and unfettered when the NORLANDIA pitched, heaved and rolled. *See supra* at 5–7. Defendants' acts and/or omissions with regard to the improper stowage of the cargo constitutes a failure to properly care for the cargo commensurate with the nature and characteristics of the cargo.

As affirmative defenses, Defendants argue that there was an inherent defect in the cargo, *see* 46 U.S.C.App. § 1304(2)(m), and/or insufficient packaging caused the damage. *See* 46 U.S.C.App. § 1304(2)(n). Plaintiffs contend that such defenses can not be raised because the NORLANDIA unreasonably deviated to New Orleans, rather than going directly to Chile. Alternatively, Plaintiffs attack each of Defendants' defenses.

■ The Court need not determine whether there was an unreasonable deviation and, if so, whether Antigua can be held responsible for the deviation. The Court also need not address Defendants' defenses because the Court finds that even if Defendants' defenses of inherent vice and improper packaging are valid, there were concurrent causes of loss. The Court has already found that Defendants were negligent due to the improper stowage of the cargo. Even if the Court was to find that the cargo had an inherent vice and/or that the cargo was improperly packaged, the Court finds that Plaintiffs have met their burden of proof by showing that Defendants' negligence was at least a concurrent cause of the damage. In addition, the Court finds that Defendants have not met their burden of apportioning the damage caused by its negligence and the damaged caused by the alleged improper packaging and/or inherent vice of the cargo. Thus, Defendants would still be liable for 100% of the damages. Even if the pipes were improperly packaged and/or had an inherent vice and if such inadequacy contributed to the damage, Defendants still cannot prevail since improper stowage also contributed to the damage. The burden rests with Defendants to show what ascertainable amount of the damage was attributable to the packaging and/or inherent vice of the pipes, from which they are excepted, and what was due to improper stowage, which is not excepted. Defendants' failure to do so results in Defendants being chargeable for the entire loss. *See The Vallescura*, 293 U.S. at 306, 55 S.Ct. at 197 (1934); *Vana Trading Co., Inc. v. S.S. "METTE SKOU"*, 556 F.2d 100 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

■ The Supreme Court, in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), stated:

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*Reliable Transfer*, 421 U.S. at 407, 95 S.Ct. at 1714. However, according to the Second Circuit, the case of *Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251.

(1975), does not apply when a shipper is suing the carrier.

The Second Circuit's reasoning is as follows: In *Reliable Transfer*, the Supreme Court overruled the maritime collision and stranding rule of equal proportionate liability regardless of degree of fault. However, before *Reliable Transfer*, cargo cases were already governed by a rule allowing for apportionment according to relative degree of fault. According to the Second Circuit, in cases when the shipper sues the carrier, and the carrier is unable to sustain its final burden of proving the relative degree of fault, the carrier must bear all the damages even though it has been established that those damages were in part caused by occurrences for which it is excepted from liability. *See S.S. "METTE SKOU",* 556 F.2d at 106. The Second Circuit admits that this is a harsh result. Nevertheless, the Second Circuit held that the rule of *The Vallescura,* clearly stated and frequently applied, must govern. *See id.*

Since the Supreme Court's decision in *Reliable Transfer,* courts have applied *Reliable Transfer* to cases involving disputes between vessels and stevedores over cargo losses. *See Hercules, Inc. v. Stevens Shipping Co.,* 765 F.2d 1069, 1075 (11th Cir.1985); *Agrico Chemical Company v. M/V BEN W. MARTIN,* 664 F.2d 85, 94 (5th Cir.1981); *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1099 (5th Cir.1981); *Maurice Pincoffs Company v. Dravo Mechling Corporation,* 697 F.Supp. 244, 251 (E.D.La.1987), *aff'd,* 880 F.2d 411 (5th Cir.1989). In such cases, between vessels and stevedores, that is, indemnity suits, courts have held that when there is no evidence to determine what proportion of the damage is attributable to each of the wrongdoing parties, damages should be assessed in equal proportions. *See Master Shipping Agency, Inc. v. M.S. FARIDA,* 571 F.2d 131, 133–34 (2d Cir.1978); *Maurice Pincoffs Co.,* 697 F.Supp. 244.

This Court, however, is unaware of any cases that hold when a shipper sues a carrier, and both are somewhat at fault, and there is no evidence to determine what proportion of the damage is attributable to each of the

wrongdoing parties, damages are assessed in equal proportion. The Fifth Circuit, five years after the Supreme Court decided the *Reliable Transfer* case, still applied *The Vallescura* rule. The Fifth Circuit held that "the carrier bears the final burden of separating the portion of the damage due to a COGSA excepted cause from that resulting from its own negligence." *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour,* 629 F.2d 338, 381 (5th Cir.1980). Failure of the carrier to meet this burden results in the carrier being responsible for all of the damage to the cargo.

Defendants have failed to meet their burden to allow the Court make a finding as to the allocable percentages of the degree of fault. Therefore, even if Defendants' improper packaging and/or inherent vice defenses were viable, Defendants would still be liable for 100% of the damages.

### E. PER PACKAGE LIMITATION

COGSA section 4(5) provides as follows:

Neither the carrier nor the ship shall in any event become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C.App. § 1304(5). "Congress enacted the COGSA limitation on liability in 1936 in order to restrain the superior bargaining power wielded by carriers over shippers by setting a reasonable limitation on liability that the carrier could not reduce by contract." *Insurance Company of North America v. M/V OCEAN LYNX,* 901 F.2d 934, 939 (11th Cir.1990), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991) (citing *Sony Magnetic Prods., Inc. v. Merivienti O/Y,* 863 F.2d 1537, 1542 (11th Cir.1989)).

According to the Eleventh Circuit, under COGSA, "a carrier has limited liability providing that the carrier gives the shipper adequate notice of the $500 limitation by including a clause paramount in the bill of lading and the carrier gives the shipper a fair opportunity to avoid COGSA's limitation by

declaring excess value." *Unimac Company, Inc. v. C.F. Ocean Service, Inc.,* 43 F.3d 1434, 1438 (11th Cir.1995) (citing *OCEAN LYNX,* 901 F.2d at 939).

■ Generally, the burden rests on the shipper to declare a value of goods and pay a higher rate if the shipper wishes to avoid COGSA's $500 limitation of liability. *See Heri v. Fritz Companies, Inc.,* 841 F.Supp. 1188, 1191 (N.D.Ga.1993) (citing *Caterpillar Americas Co. v. S.S. SEA ROADS,* 231 F.Supp. 647, 650 (S.D.Fla.1964), *aff'd,* 364 F.2d 829 (5th Cir.1966)). However, a carrier cannot limit its liability under COGSA unless the shipper is afforded a fair opportunity to declare a higher value and pay a correspondingly higher rate. *See id.* at 1192 (citing *Caterpillar, Inc. v. S.S. ENTERPRISE,* 725 F.Supp. 1255, 1258 (S.D.Ga.1989)).

■ The bill of lading in the current case contained a "Paramount Clause" which stated the following:

The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

In a round about way, this clause states that COGSA applies. Noticeably absent from this clause, however, is reference to section 4(5) of COGSA, 46 U.S.C.App. § 1304(5), and the recitation of the terms of that section.

In *Unimac Company, Inc.,* the bill of lading not only expressly incorporated COGSA, but it also contained a separate provision that set forth the liability limitation of $500 per package and detailed the steps that the shipper needed to take to avoid the liability limitation. The Eleventh Circuit held that the bill of lading afforded the shipper notice and a fair opportunity to declare a higher value for its cargo. Similarly, in *M/V OCEAN LYNX* the bill of lading also contained an express recitation of the $500 limitation rather than merely incorporating COGSA, and the Eleventh Circuit held that there was an adequate opportunity to avoid COGSA section 4(5)'s limitation of liability.

In the instant action, the Court finds that the "Paramount Clause" failed to give Plaintiffs a fair opportunity to avoid COGSA section 4(5)'s limitation of liability since the bill of lading merely incorporated COGSA.

As an analogy, the Court looked at airline cases, in which the airlines are required to include on their tickets a notice of the limitation which a carrier imposes on liability for baggage loss or damage. The Court finds the following United States Court of Appeals for the District of Columbia Circuit's statement very persuasive:

passengers [should] be afforded ample opportunity to comprehend the limitations of liability to which they are subjected.... Passengers are not to be required to traverse an obstacle course created by the carriers in order to successfully discover the nature of their rights and substance of the carriers' limitations on liability. The passenger is to receive full and effective notice of any limitations of liability so that alternative protection may be obtained.

*Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Board,* 479 F.2d 912, 917 (D.C.Cir.1973). The Court is well aware that the shipper in the instant action is not like the passengers discussed above since the shipper in the instant action is a commercial business entity. Nevertheless, the Court finds that mere incorporation of COGSA into the bill of lading does not give the shipper a fair opportunity to opt out of COGSA section 4(5)'s limitation by declaring a higher value. *See, e.g., Institute of London Underwriters v. Sea–Land Service, Inc.,* 881 F.2d 761, 766 (9th Cir.1989) ("if the bill of lading contains an express recitation of the $500 limitation (rather than a mere incorporation of COGSA without more), and [recites] the opportunity to avoid that limitation by declaring a higher value and paying additional freight, the bill of lading will constitute prima facie evidence that the shipper was given the requisite fair opportunity."); *Heri,* 841 F.Supp. at 1192 ("shipper is deemed to have been provided

with a fair opportunity to declare value in a bill of lading, if the bill of lading **refers directly to the damage limitation of § 1304(5) of COGSA** and to the published tariff which supplied the shipper with options that would increase the carrier's liability.") (emphasis added); *Sony Magnetic Products Inc. of America v. Merivienti O/Y,* 668 F.Supp. 1505, 1511 (S.D.Ala.1987) ("express recitation in a bill of lading of the language contained in 46 U.S.C. § 1304(5) is prima facie evidence that the carrier gave the shipper that opportunity" to declare a higher value for the goods to be shipped), *aff'd,* 863 F.2d 1537 (11th Cir.1989).

The Court finds that bill of lading in the instant action does not constitute prima facie evidence that the shipper was given the requisite fair opportunity. Further, the Court finds that Defendants have failed to submit sufficient evidence showing that the shipper was given the requisite fair opportunity. Accordingly, COGSA section 4(5)'s limitation of liability will not apply in this action.

### F. DAMAGES

■ The basic philosophy in cargo cases is to indemnify the injured party and thus to place the party in the same position that it would have been but for the loss. *See Interstate Steel Corp. v. S.S. CRYSTAL GEM,* 317 F.Supp. 112, 121 (S.D.N.Y.1970). A cargo interest is only entitled to recover for its actual loss. *See Dixie Plywood Co. v. S.S. FEDERAL LAKES,* 404 F.Supp. 461

(S.D.Ga.), *aff'd,* 525 F.2d 691 (5th Cir.1975), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976).

■ The measure of damages is the difference between the fair market value of the cargo in good condition at the port of destination, and the fair market value of the cargo in its damaged condition at the port of destination. *See Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225 (11th Cir.1983); *Cook Industries, Inc. v. Barge UM–308,* 622 F.2d 851 (5th Cir.1980). The burden to prove damages is on Plaintiffs. In addition to loss in market value, there are necessary expenses incidental to loss. These expenses are also recoverable.

■ Price Brothers' Alan Holston found that over 90% of the pipes had extensive structural cracks and delaminations, requiring rejection. He further concluded that using the remainder of the pipes, **although not ostensibly damaged,** to transport an environmentally hazardous effluent would not be prudent. *See* Proposed Findings of Fact and Conclusions of Law (Doc. No. 50) at 15. The Court, however, finds that since these remaining pipes were not damaged they should not have been rejected.

The Court finds that Armco sustained damages in the amount of $2,677,589.50. However, in December, 1991, Cruz paid Armco part of its claim for these damages.[3] The calculation of damages is as follows:

| | |
|---|---:|
| 207 pieces of 900mm pipe | $ 999,685.80 |
| 290 pieces of 1000mm pipe | 1,463,862.00 |
| 420 900mm FRP pipe gaskets | 3,099.60 |
| 592 1000mm FRP pipe gaskets | 4,807.04 |
| 1000' ¾ dia. Nylon reinforced hose | 800.00 |
| 9000' ¾ dia. Nylon reinforced hose | 7,200.00 |
| 1000 ½" × 3" Thread × PE Nipples | 656.00 |
| | $2,480,110.44 |
| | |
| Export Packing | 28,550.00 |
| Handling Forwarding | 5,464.25 |
| Inland Freight | 23,821.91 |
| | $2,537,946.60 |

**3.** Plaintiffs have told the Court that Cruz reimbursed Armco for 58% of its loss. However, the Court was not informed of the numerical amount that Cruz paid to Armco. Nor was the Court informed as to the figure Cruz paid Armco 58% of. Thus, the Court will simply let Armco collect for the total amount of the damages from Defendants. Cruz, of course, can seek reimbursement from Armco.

| | |
|---|---:|
| Ocean Freight | $ 408,000.00 |
| Marine Insurance | 10,732.75 |
| | $2,956,679.35 |
| | |
| Fees, customs agent | 3,802.00 |
| Carriage | 9,906.00 |
| Commissions and tax | 14,360.00 |
| Banking negotiation and expenditure | 7,982.00 |
| Freight from port to Celpac | 11,396.00 |
| Commission for credit, Comex, stamps and seals for letter of credit, telexing expenses, notary's expenses, correspondents expenses tax on promissory note | 4,553.00 |
| | $3,008,678.35 |
| Financial charges, custom duties, value added tax | 411,644.00 |
| | $3,420,322.35 |
| | |
| Inspection expenditure (accommodation, car rental, freight, air taxes, services, endorsed by DeSalco, Muviterre Ltd., Servipor) | 26,504.00 |
| Inspection fees and expenditure (Alan Holston of Price Brothers) | 30,000.00 |
| Shipping of pipes from port to Armco plant | 6,204.00 |
| Emporchi port storage charges | 13,602.95 |
| | $3,496,633.30 |
| | × 90% |
| | $3,146,969.97 |
| | |
| Assorted Merchandise not Damaged | (19,475.24) |
| Adjustment for Cruz's payment for lost pipes | (142,825.58) |
| 4 pipes accepted by Armco | (19,296.00) |
| Expenses up to FOB on the 4 pipes | (459.18) |
| Ocean Freight on the 4 pipes | (3,239.26) |
| Insurance on the 4 pipes | (85.21) |
| | $2,961,589.50 |
| | |
| Net proceeds from selling damaged pipe | (284,000.00) |
| TOTAL LOSS | $2,677,589.50 |

---

Generally, prejudgment interest is awarded in admiralty cases. *See M/V OCEAN LYNX,* 901 F.2d 934. Interest is treated as part of the loss and not just for the delay in payment of the decree. *See Gulf Oil Corp. v. Panama Canal Co.,* 481 F.2d 561, 570 (5th Cir.1973). Prejudgment interest is not a penalty but compensation for the use of funds that were rightfully the claimants'. *See Self v. Great Lakes Dredge & Dock Company,* 832 F.2d 1540, 1550 (11th Cir.1987), *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988). The Court has discretion to deny prejudgment interest only when "peculiar circumstances" make it inequitable for the losing party to pay prejudgment interest. *See id.; Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir.1986). The Court finds that no such peculiar circumstances exist.

Admiralty courts have discretion in awarding prejudgment interest. *See Kilpatrick Marine Piling v. Fireman's Fund Insurance Co.,* 795 F.2d 940 (11th Cir.1986). Admiralty courts have broad discretion in setting prejudgment interest rates and may look to state law or other reasonable guideposts. In awarding prejudgment interest, a district court must insure that the award is not punitive in nature. *Osterneck v. E.T. Barwick Industries, Inc.,* 825 F.2d 1521 (11th Cir.1987), *aff'd,* 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). Because the award of prejudgment interest is compensatory rather than punitive, the award must be tempered by an assessment of the equities.

 Armco should get prejudgment interest in the amount of 10% of the total loss from the time of the loss, December 23, 1989, until Cruz reimbursed Armco for some of the loss in December, 1991. Thereafter, Armco should receive prejudgment interest of 10% on the total loss less the payment received by Cruz up to the date of judgment. The Court finds 10% to be the appropriate rate since Armco had to borrow money due to the damages it sustained and this represents Armco's cost of borrowing.

 Cruz should receive pre-judgment interest in the amount of 4.41% on the amount it paid Armco from the date it paid Armco for part of the loss in December, 1991, to the date of the judgment, since this was the interest rate at the time Cruz paid the subrogated portion of this claim to Armco. Additionally, this is the rate of interest that Plaintiffs suggest in Plaintiffs' Reply Brief (Doc. No. 80), and the Court finds this rate to be fair and reasonable.

 There is a problem with regard to calculating the prejudgment interest since the Court finds that Armco and Cruz should be awarded prejudgment interest with different rates, and the Court was not informed as to the amount Cruz paid to Armco.

Since it is Plaintiffs' burden to prove damages, this oversight shall be construed against Plaintiffs. Defendants should not have to pay prejudgment interest in the rate of 10% on the total loss after December 1, 1991, the date Cruz paid Armco for part of its loss. Thus, Armco shall receive prejudgment interest in the amount of 10% on the total loss from December 23, 1989, up until December 1, 1991, and prejudgment interest in the amount of 4.41% on the total loss thereafter.

Accordingly, it is **ORDERED AND ADJUDGED:**

(1) The Clerk is directed to enter Judgment in favor of Armco Chile Prodein, S.A., and against Defendants M/V NORLANDIA, *in rem*, and Scheepvaartmij Antigua, *in personam*, jointly, in the amount of $2,677,-589.50, together with prejudgment interest of 10% per annum on $2,677,589.50 from December 23, 1989, up until December 1, 1991, and prejudgment interest of 4.41% per annum on $2,677,589.50 thereafter up until the date of the Judgment;

(2) the Clerk shall tax costs accordingly; and

(3) the Clerk is directed to close the file.

**DONE AND ENTERED.**